IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA LUCARELLI,<br><br>    Plaintiff,<br>  v.<br><br>PAUL DILLARD, LETHEL POLK, and DOES ONE THROUGH TEN, inclusive,<br><br>    Defendants | No. C-05-1590 MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING SUMMARY JUDGMENT IN FAVOR OF "DOE" DEFENDANTS AS TO THIRD CAUSE OF ACTION; VACATING HEARING** |

Before the Court is the motion, filed May 26, 2006 by defendants Paul Dillard ("Dillard") and Lethel Polk ("Polk"), for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Teresa Lucarelli ("Lucarelli") has filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court deems the matter appropriate for decision on the papers, VACATES the hearing scheduled for July 14, 2006, and rules as follows.

**BACKGROUND**[1]

At the time of the events alleged in Lucarelli's complaint, Lucarelli worked at Pelican Bay State Prison ("Pelican Bay") as a Correctional Counselor II. (Joint Statement of Undisputed Material Facts ("UMF") 3.) Lucarelli's job duties included "supervising and

---

[1] The following facts are either undisputed or, if disputed, stated in the light most favorable to Lucarelli.

helping inmates with their prison activities, such as their job and housing assignments." (Lucarelli Decl. ¶ 1.)  Lucarelli had been working with the Inmate Assignment Office, specifically, with Lieutenant Michael Smelosky ("Smelosky") and Rebecca Cox ("Cox"), a Correctional Counselor II, "regarding hiring of inmates" at Pelican Bay.  (Lucarelli Dep. at 46:13-16.)[2]

On April 30, 2003, Lucarelli stopped by the Inmate Assignment Office because Smelosky had some questions about inmate assignments.  (UMF 10.)[3]  When Lucarelli arrived, Smelosky and Cox were discussing a memo that Lucarelli had not read.  (UMF 13.)  Smelosky and Cox asked Lucarelli whether, when Lucarelli had been the Inmate Assignment Lieutenant at High Desert State Prison, inmates had been allowed to sort mail.  (Id.)  Lucarelli stated, "No," explaining it would be a breach of security.  (Id.; Lucarelli Dep. at 47:18-19.)  Cox then stated she was holding a memo indicating inmates were sorting mail at Pelican Bay.  (UMF 14.)  During this conversation, defendant Dillard entered the office.  (UMF 16.)  Dillard was the Associate Warden over Central Services; his responsibilities included operating the mail room.  (UMF 7, 16.)

Dillard asked those present in the Inmate Assignment Office what issues they had with the mail room.  (UMF 16.)  Lucarelli responded by stating inmates, because of security concerns, should not be sorting mail and that Dillard was violating state regulations and jeopardizing the safety and security of the institution.  (UMF 17, 18.)  In fact, the Warden of Pelican Bay had previously decided to deviate from the "department operations manual" and allow inmates to lift mail bags off trucks and sort magazines from recognized publishers, and "headquarters" had given the Warden the authority to allow such a practice, because it did not impact the safety and security of the institution.  (UMF 25, 26; Dillard

---

[2] Excerpts from Lucarelli's deposition are attached as Exhibit A to the Beaty Declaration.

[3] Lucarelli and Smelosky previously worked together at High Desert State Prison, where Lucarelli had been the Inmate Assignment Lieutenant.  (Id.)

1 Dep. at 65:4-21.)[4]

2     Dillard believed Lucarelli was directing Dillard's subordinate, Smelosky, to act contrary to directions already given by the Warden. (UMF 28.)[5] Dillard responded to Lucarelli's comments by yelling, "Hey, that's none of your business. You're the CC2 for Facility B. You have no business with the mail room. It doesn't concern you. If you have issues of Facility B with inmate assignments, that's why inmate assignments is here, to help you, but don't go outside your area." (UMF 29, 30.) Additionally, in a "surly voice," Dillard stated, "If you don't have enough to do, I will talk to your supervisor to get you something to do." (UMF 29.) Lucarelli responded, "Yes, you are right, it is your area" and, "No problem." (UMF 32.) Dillard then left the Inmate Assignment Office, after which Smelosky and Cox apologized for Dillard's actions and for bringing Lucarelli into the conversation. (Lucarelli Dep. at 57:14-16.) Lucarelli went directly to see Polk, the Associate Warden of General Population, who was Lucarelli's superior officer. (UMF 9, 33.) When Lucarelli described the above exchange with Dillard, Polk told Lucarelli to write him a memorandum in his capacity as the "EEO Coordinator." (UMF 33.) That evening, Dillard decided he had "improperly admonished" Lucarelli in front of her peer Cox, and determined to apologize to Lucarelli the next day. (UMF 36.)

    The next day, May 1, 2003, Lucarelli dropped off in Polk's office the memorandum she had written at Polk's request. (UMF 37.) As Lucarelli left Polk's office, Dillard stated he wanted to talk to her, "pushed and guided" her into Polk's office, closed the door, stood in front of the door, and stated he wanted to apologize. (UMF 39.) Polk, who was behind his desk, (id.), told Lucarelli that Dillard "just want[ed] to apologize" and to sit down and listen. (Lucarelli Dep. at 69:20-22.) Lucarelli did not feel she could leave. (UMF 39.) Dillard then apologized, stating he "did some further investigation and realized it wasn't [Lucarelli's] fault." (Lucarelli Dep. at 70:3-4.) Lucarelli did not listen to anything else Dillard

---

[4] Excerpts from Dillard's deposition are attached as Exhibit D to the Beaty Declaration.

[5] Lucarelli was not in Dillard's chain of command. (UMF 9.)

3

said, and, when asked by Polk if she would accept Dillard's apology, she refused. (Id. at 70:17-19.) Lucarelli believed Dillard was not sincere. (UMF 41.) Dillard stated Lucarelli did not have to accept his apology and moved away from the door, at which point Lucarelli left. (UMF 41.)

At a later date, undisclosed in the record, during a meeting of associate wardens and other prison employees, Associate Warden Dan Smith heard Dillard make a "general comment about he didn't think much of [Lucarelli] as an employee." (UMF 47, 48, 49.) On another date, also undisclosed in the record, Mark Ater ("Ater"), a Corrections Counselor II supervisor, was in a hallway discussing Lucarelli with "somebody else," perhaps a captain,[6] (Ater Dep. at 7:4-11),[7] when Dillard made a comment that she had nothing coming to her, (UMF 53.) On another occasion, during a break in a meeting, again on a date undisclosed in the record, Ater spoke to Dillard, at which time Dillard "indicat[ed]" that Lucarelli had made a bad mistake taking him to task and that he had a lot of witnesses that would testify in his behalf regarding the lawsuit. (Ater Dep. at 12:19-24.)

Lucarelli did not apply for a promotion because she felt Dillard had "poisoned the well," making any application "futile," and because she was experiencing emotional distress that prevented her from handling more responsibility. (UMF 80.)[8]

## LEGAL STANDARD

Pursuant to Rule 56, a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

---

[6]There is no evidence in the record as to what Ater and the other person may have been discussing when Dillard came upon them.

[7]Excerpts from Ater's deposition are attached as Exhibit I to the Beaty Declaration.

[8]Beginning in July 2004, Lucarelli began receiving treatment from therapist Marie Witt, PhD ("Dr. Witt) for depression, anxiety and stress. (Witt Dep. at 13:6-14, 19:7-22). Dr. Witt's notes indicate Lucarelli was "quite distressed" by the comments Dillard made on April 30, 2003 and by having to listen to his apology. (Lucarelli Decl. Ex. A at 4.) Dr. Witt's note also indicate that Lucarelli reported she had been a victim of child molestation for many years, and Dr. Witt "suspect[ed]" Lucarelli's "current situation has exacerbated the [stress] she has from the earlier molest." (Id. Ex. A at 6.)

4

1  is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(c).

2  The Supreme Court's 1986 "trilogy" of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact.  Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See <u>Celotex</u>, 477 U.S. at 324 (quoting Rule 56(c)).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Liberty Lobby</u>, 477 U.S. at 249-50 (citations omitted).  "'[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion.'"  See <u>Matsushita</u>, 475 U.S. at 587 (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)).

**DISCUSSION**

In her complaint, Lucarelli alleges Dillard and Polk deprived her of her Fourth Amendment rights by forcing her into and/or forcing her to remain in Polk's office on May 1, 2003.  Lucarelli also alleges Dillard deprived her of her First Amendment rights by engaging in retaliation after she stated inmates should not be allowed to sort mail and that Dillard was violating the law.  Additionally, Lucarelli sets forth various state law claims against Dillard arising from these factual allegations, as well as a claim against "Doe" defendants for failing to properly supervise, train, and discipline Dillard and Polk.

Defendants argue they are entitled to summary judgment as to all claims against Dillard and Polk.

//

//

5

**I. Federal Claims**

    **A. Fourth Amendment**

In her First Cause of Action, Lucarelli alleges Dillard "physically seiz[ed] and detain[ed] her in violation of her Fourth Amendment rights" and that Polk "assist[ed]." (See Compl. ¶ 31.) As noted, this claim arises from the May 1, 2003 incident in which Dillard "pushed and guided" Lucarelli into Polk's office and stood in front of the door while he apologized to her. (See UMF 39.) Defendants argue such conduct does not, as a matter of law, constitute an unreasonable seizure under the Fourth Amendment, noting a "seizure" for Fourth Amendment purposes is generally understood as involving such activities as an investigatory stop or an arrest. See, e.g., Hansen v. Black, 885 F. 2d 642, 644 (9th Cir. 1989) (considering merits of unreasonable seizure claim brought by plaintiff who had been arrested and handcuffed).

Relying on Michigan v. Chesternut, 486 U.S. 567 (1988), Lucarelli argues that because a reasonable person in her position would not have felt free to leave Polk's office, she was subject to a seizure within the meaning of the Fourth Amendment. See id. at 573 ("[T]he police can be said to have seized an individual only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.")

To constitute a Fourth Amendment violation, the acts on which the plaintiff relies must be committed "under color of state law." See, e.g., Van Ort v. Estate of Stanewich, 92 F. 3d 831, 838 (9th Cir. 1996). "[A]cts committed by a police officer even while on duty and in uniform are not under color of state law unless they are in some way related to the performance of police duties." Id. (alteration in original; internal quotation and citation omitted), cert. denied, 519 U.S. 1111 (1997); see also Delcambre v. Delcambre, 635 F. 2d 407, 408 (5th Cir. 1981) (holding where on-duty chief of police "restrained and assaulted" plaintiff at police station, plaintiff not deprived of constitutional rights because "altercation arose out of an argument over family and political matters and [plaintiff] was neither arrested nor threatened with arrest").

6

At the time of the incident at issue herein, Dillard, Polk, and Lucarelli all were employed as law enforcement officers. Even assuming a trier of fact might find, as Lucarelli argues, that a reasonable person in Lucarelli's position would not have felt free to leave Polk's office, Lucarelli offers no evidence, nor even argues, that the actions taken by Dillard and/or Polk were in any way related to a law enforcement purpose. Rather, it is apparent that their actions were taken in connection with what can only be characterized as a workplace dispute among persons who happened to be law enforcement officers.[9] Under such circumstances, Lucarelli has failed to raise a triable issue as to whether Dillard and/or Polk subjected her to an unreasonable seizure within the meaning of the Fourth Amendment.

Accordingly, defendants have shown Dillard and Polk are entitled to summary judgment as to the First Cause of Action.

**B. First Amendment**

In her Second Cause of Action, Lucarelli alleges Dillard "retaliated against her" for having engaged in activity protected by the First Amendment. (See Compl. ¶ 36.) As set forth in her opposition, the protected activity on which Lucarelli relies is the commentary Lucarelli made in the Inmate Assignment Office on April 30, 2003 regarding inmates sorting mail.[10]

"In order to establish a prima facie case of retaliation under the First Amendment, [the plaintiff] must show that (1) she engaged in protected speech; (2) the defendants took an adverse employment action against her; and (3) her speech was a substantial or

---

[9] According to Lucarelli, Dillard "seemed sarcastic in his apology." (See Lucarelli Decl. ¶ 8.) Even if a trier of fact were to so find, such finding would not assist Lucarelli, who, as discussed, fails to offer evidence that any such conduct on the part of Dillard was related to a law enforcement purpose.

[10] In her complaint, the sole alleged protected activity identified is Lucarelli's having "petition[ed]" the Warden. (See id.) Such petitioning involved Lucarelli's having written the above-described memorandum, dated May 1, 2003, given to Polk and addressed to the Warden. (See UMF 37; Beaty Decl. Ex. B.) In her opposition, however, Lucarelli does not rely on such activity; rather, Lucarelli relies solely on the comments she made in the Inmate Assignment Office on April 30, 2006. (See Pl.'s Opp., filed June 23, 2006, at 4:5-14.) Defendants have stated no procedural objection to this change in Lucarelli's theory.

7

motivating factor for the adverse employment action." Thomas v. City of Beaverton, 379 F. 3d 802, 807-08 (9th Cir. 2004) (internal quotations omitted). Defendants argue Lucarelli cannot establish a prima facie case of retaliation.

At the outset, defendants have raised a serious question as to whether Lucarelli's verbal exchange with Dillard constitutes protected speech. "An employee's speech is protected under the First Amendment if it addresses a matter of legitimate public concern." Coszalter v. City of Salem, 320 F. 3d 968, 973 (9th Cir. 2003). In an attempt to characterize her workplace statements as speech protected by the First Amendment, Lucarelli asserts she was "[b]lowing the whistle on a state official's violation of important state policies." (See Pl.'s Opp. at 10:26-27.) As Lucarelli notes, courts have recognized that speech disclosing "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." See Thomas, 379 F. 3d at 809 (citing cases). Here, however, it is undisputed that Lucarelli was unaware the Warden had sought and obtained from the California Department of Corrections permission to "deviate" from an "operations manual" and allow inmates to engage in limited work in the mail room. (See UMF 15, 25, 26.) Put another way, it is undisputed that Lucarelli, speaking without any knowledge of the pertinent facts, falsely accused Dillard of violating a law, and did so in front of at least three of his subordinates. Under such circumstances, it is unclear how Lucarelli's statements constitute a matter of public concern.

Assuming, arguendo, Lucarelli's statements in the Inmate Assignment Office constituted protected speech, Lucarelli's First Amendment claim nevertheless fails because, as defendants point out, Lucarelli has failed to offer evidence to support a finding that Dillard subjected Lucarelli to an adverse employment action in response to her having made the above-referenced statements to him and to his subordinates.

In that regard, the Court initially notes that Lucarelli offers no evidence that her working conditions, duties, or employment opportunities were adversely affected by Dillard, or even that he threatened to take any such action. Indeed, it is undisputed that Lucarelli did not lose any "special assignments" because of any act by Dillard, (see UMF 76), that

Dillard never prevented Lucarelli from serving as Acting Captain, (see UMF 77), and that Lucarelli never lost any pay or any benefits as a result of anything Dillard did, (see UMF 81).[11]  Rather, in arguing she was subjected to an adverse employment action, Lucarelli relies on the following:  (1) Dillard's having "angrily berated her" in front of others on April 30, 2003; (2) Dillard's pushing her into Polk's office, standing in front of the door, and proceeding to apologize in a manner she believed was "sarcastic"; and (3) Dillard's having made three "disparaging" comments about her.  (See Pl.'s Opp at 13:13-19.)  Even if the loss of an employment benefit is not a prerequisite to Lucarelli's retaliation claim, see Coszalter, 320 F. 3d at 976-76, none of these actions, alone or taken together, are sufficient to constitute an adverse employment action.

With respect to the first assertedly adverse action Lucarelli identifies, the evidence construed in the light most favorable to Lucarelli is that after she accused Dillard of breaking the law, he responded in a loud voice, with words to the effect that this was not her area of concern and she had no idea what she was talking about.  Even if Dillard's statements are characterized as harsh, such responsive speech is not, as a matter of law, an adverse employment action.  See Nunez v. City of Los Angeles, 147 F. 3d 867, 874-75 (9th Cir. 1998) (holding scolding, harsh words and threats to transfer or dismiss insufficient to support First Amendment retaliation claim); see also Coszalter, 320 F. 3d at 976 (noting "bad-mouthing" by supervisor not adverse employment action).  Similarly, Lucarelli's being "forced" to sit in her superior officer's office and listen, or pretend to listen, to an apology is not the type of conduct that can be characterized as an adverse employment action, thus depriving Lucarelli of a constitutional right, even if the apology was made in a sarcastic tone.  Cf. Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006) (holding, in context of Title VII retaliation claim, "petty slights, minor annoyances, and simple lack of good manners" are not adverse employment actions).

---

[11]Lucarelli did testify that she decided not to apply for a promotion after April 30, 2003 because she thought Dillard would block any such application.  Because she never applied for a promotion, however, she can only speculate as to what Dillard might or might not have done, let alone the outcome thereof.

9

The remaining conduct, comprised of comments reportedly made by Dillard, likewise is insufficient. Each of the three comments is fragmentary, ambiguous, and offered without sufficient context to enable a reasonable trier of fact to assess meaningfully the content or purpose thereof. Moreover, because Lucarelli fails to offer any evidence as to when the comments were made, there is no evidence to support a finding that any of those comments was made in response to Lucarelli's remarks of April 30, 2003.[12] In any event, even if Lucarelli had demonstrated that Dillard made the comments in response to Lucarelli's earlier criticism of him, such commentary is not actionable. "It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation." Nunez, 147 F. 3d at 875.

Accordingly, defendants have shown Dillard is entitled to summary judgment as to the First Cause of Action.

**C. Supervisorial Liability**

In her Third Cause of Action, Lucarelli alleges that "supervisory Doe defendants" violated her constitutional rights by failing to adequately "train, supervise or discipline" Dillard and Polk. (See Compl. ¶ 39.) This claim is derivative of Lucarelli's claims against Dillard and Polk. (See id.)

Where a supervisor is not personally involved in the deprivation of a constitutional right, the supervisor nonetheless may be found liable if the plaintiff demonstrates "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." See Hansen, 885 F. 2d at 646.

Here, at the outset, the Court notes that Lucarelli has failed to name a defendant to the Third Cause of Action, nor has she sought to amend her complaint to do so. In any event, an amendment to name the "Doe" supervisors would be futile, in light of Lucarelli's having failed to establish that either Dillard or Polk deprived her of any constitutional right.

---

[12] Indeed, one of the three comments, specifically, Dillard's indicating to Ater that Lucarelli had made a "bad mistake" and that he had witnesses that would testify regarding the "lawsuit" appears to be responsive to Lucarelli's having filed the instant action. (See Ater Dep. at 12:19-24.)

10

Accordingly, the Court will grant summary judgment in favor of the "Doe" defendants on the Third Cause of Action. See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44 F. 3d 800, 803 (9th Cir. 1995)) (affirming district court's granting summary judgment in favor of nonappearing defendant, where plaintiff, in response to motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issue as to claim against nonappearing defendant).

**II. State Law Claims**

Lucarelli's remaining claims, the Fourth through Twelfth Causes of Action, are state law claims against Dillard.[13] By order filed September 28, 2005, the Court dismissed the Seventh Cause of Action, which alleged a claim under the California Whistleblower Protection Action, and limited the scope of the remaining state law claims to "conduct occurring within six months of March 7, 2005." (See Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss Compl. at 4:14-15.)

Defendants argue that Dillard is entitled to summary judgment as to the remaining state law claims because Lucarelli has failed to offer any evidence of actionable conduct by Dillard that occurred on or after September 7, 2004.

Lucarelli's battery and false imprisonment claims, respectively, the Fourth and Fifth Causes of Action, are based solely on conduct occurring on May 1, 2003. (See UMF 1, 2.) Consequently, as Lucarelli concedes, (see Pl.'s Opp. at 23:27-28), she cannot establish such claims.

The remaining state law claims are claims for defamation (Sixth Cause of Action), intentional infliction of emotional distress (Eighth Cause of Action), negligent infliction of emotional distress (Ninth Cause of Action), intentional interference with prospective economic relations (Tenth Cause of Action), negligent interference with prospective economic relations (Eleventh Cause of Action), and negligence (Twelfth Cause of Action).

---

[13]By order filed September 28, 2005, the Court dismissed Lucarelli's state law claims against Polk. (See Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss Compl. at 4:14-15.)

11

Although Lucarelli argues that some of the conduct on which she bases such claims occurred on or after September 7, 2004, she fails to identify any evidence to that effect.

Accordingly, defendants have shown Dillard is entitled to summary judgment on the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh and Twelfth Causes of Action.

## CONCLUSION

For the reasons stated above,

1. Defendants Dillard and Polk's motion for summary judgment is hereby GRANTED; and

2. Summary judgment in favor of the "Doe" defendants is hereby GRANTED.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: July 19, 2006

MAXINE M. CHESNEY
United States District Judge